**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AES SOLAR ENERGY COÖPERATIEF U.A. and AMPERE EQUITY FUND B.V., | |
| *Petitioners*, | Civil Action No. 1:21-cv-3249-RJL |
| v. | **Hon. Richard J. Leon** |
| KINGDOM OF SPAIN, | **Oral Argument Requested** |
| *Respondent*. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE KINGDOM OF SPAIN'S
<u>MOTION TO DISMISS THE PETITION</u>**

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC  20024
Tel.:     (202) 434-5000
Fax:     (202) 434-5029
Email:   jlandy@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.    The Parties ................................................................................................ 3

    B.    The Applicable Legal Framework ........................................................... 3

           1.    The legal order of the European Union .................................... 3

           2.    The impermissibility of international arbitration by Member States concerning matters of EU law ................................................. 5

           3.    The European Commission's state-aid decision regarding Spain ............. 10

           4.    The Energy Charter Treaty ....................................................... 12

    C.    The Arbitration .................................................................................... 13

STANDARD OF REVIEW ......................................................................................... 14

ARGUMENT ............................................................................................................... 15

I.      THE PETITION FAILS FOR LACK OF SUBJECT-MATTER JURISDICTION. ........ 15

    A.    The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply. ................. 16

           1.    Under EU law, there was no agreement to arbitrate. ............................... 16

           2.    The EU's interpretation of its own law is binding on the Court. ............. 17

    B.    The "Waiver Exception" in Section 1605(a)(1) Does Not Apply. ....................... 19

II.    THE COURT SHOULD REFUSE ENFORCEMENT UNDER THE NEW YORK CONVENTION. .......................................................................................... 22

III.   THE PETITION SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE. ....................................................................... 23

IV.   IN THE ALTERNATIVE, THE PETITION SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*. .............................................. 24

CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**European Union Cases**                                                                       **Pages**

\*  *Achmea B.V. v. Slovak Republic*,
    CJEU Case No. C-284/16, ECLI:EU:C:2018:158 (6 Mar. 2018)................................... *passim*

\*  *Achmea B.V. v. Slovak Republic*,
    German Federal Court of Justice, Case No. 1 ZB 2/15 (31 Oct. 2018) ...............................6, 7

*Budějovický Budvar v. Rudolf Ammersin GmbH*,
    CJEU Case No. C-478/07, ECLI:EU:C:2009:521 (8 Sept. 2009) ............................................4

*Eastern Sugar B.V. v Czech Republic*,
    SCC Case No 088/2004 .............................................................................................................10

*In re ECHR*,
    CJEU Opinion 2/13, ECLI:EU:C:2014:2454 (18 Dec. 2014) ...............................................4, 5

\*  *Republic of Moldova v. Komstroy*,
    CJEU Case No. C-741/19, ECLI:EU:C:2021:655 (2 Sept. 2021) ............................1, 9, 17, 19

*Republic of Poland v. CEC Praha*,
    Paris Court of Appeal, Op. No. 49/2022 (19 Apr. 2022)...........................................................7

\*  *Republic of Poland v. PL Holdings S.à.r.l.*
    CJEU Case No. C-109/20, ECLI:EU:C:2021:875 ......................................................9, 10, 17


**International Treaties**

Energy Charter Treaty ("ECT")................................................................................................ *passim*

Treaty on European Union ("TEU").................................................................................................3

Treaty on the Functioning of the European Union ("TFEU") ..........................................3, 4, 5, 11


**Federal Cases**

*Air France v. Saks*,
    470 U.S. 392 (1985)...................................................................................................................18

*Al Tech Specialty Steel Corp. v. United States*,
    28 Ct. Int'l Trade 1468 (C.I.T. 2004) .......................................................................................18

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018)..............................................................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................15

*Atl. Tele-Network v. Inter-Am. Dev. Bank*,
    251 F. Supp. 2d 126 (D.D.C. 2003)....................................................................25

*Balkan Energy Ltd. v. Republic of Ghana*,
    302 F. Supp. 3d 144 (D.D.C. 2018).....................................................................15

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
    137 S. Ct. 1312 (2017)..................................................................................20, 22

*Chevron Corp. v. Republic of Ecuador*,
    795 F.3d 200 (D.C. Cir. 2015).............................................................................16

*Creighton Ltd. v. Gov't of State of Qatar*,
    181 F.3d 118 (D.C. Cir. 1999)........................................................................20, 21

*F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*,
    636 F.2d 1300 (D.C. Cir. 1980)...........................................................................23

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
    665 F.3d 384 (2d Cir. 2011)...........................................................................25, 26

*Foremost–McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990).............................................................................20

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
    717 F.2d 602 (D.C. Cir. 1983).............................................................................26

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947).............................................................................................25

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S.Ct. 524 (2019)............................................................................................16

*In re Air Crash Over S. Indian Ocean*,
    352 F. Supp. 3d 19 (D.D.C. 2018)..................................................................24, 27

*In Re Monegasque de Réassurance S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*,
    311 F.3d 488 (2d Cir. 2002).................................................................................26

*In re Sealed Case*,
    825 F.2d 494 (D.C. Cir. 1987).............................................................................23

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001)...................................................................................26

*Irwin v. WWF, Inc.*,
    448 F. Supp. 2d 29 (D.D.C. 2006) ........................................................................26

*Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*,
    397 F. Supp. 3d 34 (D.D.C. 2019) ........................................................................25

*Medellin v. Texas*,
    552 U.S. 491 (2008) ..............................................................................................18

*Nat'l R.R. Passenger Corp. v. B&M Corp.*,
    850 F.2d 756 (D.C. Cir. 1988) ..............................................................................16

*Nemariam v. Fed. Democratic Republic of Ethiopia*,
    491 F.3d 470 (D.C. Cir. 2007) ..............................................................................15

*Novenergia II – Energy & Environment (SCA) EU v. Kingdom of Spain*,
    Civ. No. 18-1148 (D.D.C. Sept. 24, 2019) ............................................................8

*Nygard v. DiPaolo*,
    753 F. App'x 716 (11th Cir. 2018) ......................................................................26

*Permanent Mission of India to the U.N. v. City of New York*,
    551 U.S. 193 (2007) ..............................................................................................15

*Phx. Consulting Inc. v. Republic of Angola*,
    216 F.3d 36 (D.C. Cir. 2000) ..........................................................................20, 22

*Pitney Bowes, Inc. v. U.S. Postal Serv.*,
    27 F. Supp. 2d 15 (D.D.C. 1998) ........................................................................14

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ................................................................................28

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
    27 F.4th 771 (D.C. Cir. 2022) ..........................................................................21, 22

*Republic of Austria v. Altmann*,
    541 U.S. 677 (2004) ..............................................................................................24

*Richards v. Duke Univ.*,
    480 F. Supp. 2d 222 (D.D.C. 2007) ....................................................................14

*Rong v. Liaoning Provincial Gov't*,
    362 F. Supp. 2d 83 (D.D.C. 2005) ......................................................................14

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ..............................................................................................15

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft*
   *v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993)...................................................................................21, 22

*Simon v. Republic of Hungary*,
   911 F.3d 1172 (D.C. Cir. 2018)........................................................................28

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
   549 U.S. 422 (2007).........................................................................................24

*Smith-Haynie v. District of Columbia*,
   155 F.3d 575 (D.C. Cir. 1998)........................................................................15

*Sumitomo Shoji Am., Inc. v. Avagliano*,
   457 U.S. 176 (1982).........................................................................................18

*Tatneft v. Ukraine*,
   21 F.4th 829 (D.C. Cir. 2021).........................................................................27

*Tatneft v. Ukraine*,
   771 F. App'x 9 (D.C. Cir. 2019).....................................................................21

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007)........................................................................22

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005).............................................................26, 27, 28

*Vanover v. Hantman*, 77 F. Supp. 2d 91 (D.D.C. 1999).......................................15

*W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*,
   493 U.S. 400 (1990).........................................................................................24

*World Wide Minerals, LTD v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002)......................................................................20

## Statutes and Rules

Federal Arbitration Act ("FAA"), 9 U.S.C. § 207 ...............................................22

Foreign Sovereign Immunites Act ("FSIA"), 28 U.S.C. § 1605(a)(1) & (6) ...................... *passim*

Federal Rule of Civil Procedure 12(b)(1) .............................................................14

Federal Rule of Civil Procedure 12(b)(6) .................................................14, 15, 24

U.S. Const., art. I, § 10, cl. 3 ...............................................................................18

# INTRODUCTION

With their Petition, two European companies have traveled far abroad to the courts of the United States in an attempt to enforce an arbitral award about a European dispute against a European sovereign. Petitioners came here for a simple reason: If they had sought to enforce their award in any of the courts of the European Union—all of which are available fora for this case—those courts would have rejected their efforts under well-settled law. Petitioners know this well because those courts have already rejected similar efforts by other arbitral claimants. This case thus presents a straightforward question: whether Petitioners can use the courts of the United States to avoid decisions of European courts about European law as applied to European disputes. Under principles of sovereign immunity and international comity, they cannot.

The Petition fails for at least four reasons. *First*, the Court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). The Kingdom of Spain is presumptively immune to the jurisdiction of U.S. courts, and none of the exceptions to the FSIA applies because there was no agreement to arbitrate. Petitioners sought to initiate arbitration by accepting a purported offer to arbitrate in the Energy Charter Treaty ("ECT"), a multilateral investment treaty among fifty-three contracting parties, including Spain, a majority of the Member States of the European Union ("EU"), and the EU itself. But as the EU and its Member States have long maintained—since well before Petitioners brought their claims—the ECT's arbitration provision does not extend to disputes between Member States. Instead, those disputes must be heard in EU courts.

Petitioners thus proceeded at their own risk when they pursued arbitration—if the Member States were right about the ECT's arbitration provisions, any resulting award would be invalid and unenforceable. That risk materialized: In the seminal *Achmea* and *Komstroy* decisions, the EU's highest court, the Court of Justice, held that such arbitration provisions are incompatible with EU law and void *ab initio*. In other words, under binding EU law, the ECT

1

does not contain a valid offer to arbitrate on the part of Spain.  That means there was no offer for Petitioners to accept and no agreement to arbitrate.  As a result, Spain is immune to the Court's jurisdiction.  *See* **Part I**.

*Second*, and for the same reason, the Court should also decline to enforce the Award under Article 5 of the New York Convention because "[t]he parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid[.]" *See* **Part II**.

*Third*, enforcing the Award would violate the foreign sovereign compulsion doctrine. Under EU law, payment of the award is unlawful because it would (i) constitute state aid that has not been approved by the European Commission and which Spain is therefore prohibited from paying; and (ii) compel Spain to violate a decision of the Court of Justice.  Comity requires that U.S. courts not take action that would cause the violation of another nation's laws.  *See* **Part III**.

*Fourth*, if there were any question about the EU law above, the Court should dismiss the Petition under the doctrine of *forum non conveniens*.  Resolving any dispute would require the Court to wade into complex matters of EU law and the ECT, a treaty to which the United States is not party.  Granting the Petition would require this Court to offer an interpretation of EU law contrary to that of the EU Court of Justice, undermining that sister court, violating principles of international comity, and inviting an ever-increasing flood of enterprising petitioners into this District.  The Court should decline that invitation.  *See* **Part IV**.

## BACKGROUND

This enforcement action arises out of an investment arbitration initiated by Petitioners and several other co-claimants against the Kingdom of Spain in November 2011, alleging various violations of the Energy Charter Treaty.  *See* Pet. ¶ 13.  That proceeding was conducted under the UNCITRAL Rules and registered as PCA Case No. 2012-14.  The Tribunal issued

Preliminary Award on Jurisdiction on October 13, 2014. *See* Rozen Decl. Ex B, ECF No. 1-2 at 318 ("Jx. Dec."). It then issued the Award on February 28, 2020. *See* Rozen Decl. Ex. A, ECF No. 1-2 at 4 ("Award"). Petitioners filed this action on December 10, 2021.

### A. The Parties

Defendant is the Kingdom of Spain, a foreign sovereign and a Member State of the European Union. Pet. ¶ 3. Petitioners are AES Solar Energy Coöperatief U.A. and Ampere Equity Fund B.V. *Id.* ¶¶ 1, 2. Petitioners are entities established under the laws of the Netherlands, which is a Member State of the European Union. *Id.*; *see also* Award ¶ 525.

### B. The Applicable Legal Framework

#### 1. The legal order of the European Union

Spain is one of the twenty-seven Member States of the European Union ("EU"). Decl. of Prof. Steffen Hindelang ("Hindelang Decl.") (Feb. 24, 2022) ¶ 30.[1] The EU's foundational instruments are the Treaty on European Union (the "TEU," Hindelang Decl. Ex. 3) and the Treaty on the Functioning of the European Union (the "TFEU," Hindelang Decl. Ex. 4).[2] *Id.* The EU is comprised of several branches of government. These include the European Council, which defines the EU's overall political direction and priorities; the European Parliament, which enacts legislation; the European Commission, which "oversee[s] the application of Union law under the control of the Court of Justice of the European Union"; and the EU Court of Justice, which is the final authority on issues of EU law. *See* TEU, Arts. 14(1), 15(1), 17(1), 19.

---

[1] Steffen Hindelang is a Professor at Uppsala University in Sweden, where he specializes in EU and public international law. He has written extensively on the relationship between EU law and international investment treaties. His resume is attached to his declaration as Exhibit 1.

[2] European legal authorities and similar materials cited in this Memorandum of Law are attached to the Hindelang Declaration, along with an index of exhibits that follows his signature page.

EU law applies throughout the EU and within each Member State.  By joining the EU, each Member State agreed that EU law takes precedence and overrides any conflicting domestic law, rule, or governmental action.  This principle of primacy is fundamental to the legal order within the Europe Union.  Hindelang Decl. ¶¶ 35, 47–53.

EU law also trumps incompatible rules of law that EU Member States may have purported to create, including in international agreements or treaties concluded among them. Hindelang Decl. ¶ 51.  The EU Court of Justice has held that, as a matter of the Member States' delegation of sovereignty and the primacy of the EU Treaties, "an international agreement cannot affect the allocation of power fixed by the EU [Treaties] or, consequently, the autonomy of the EU legal system."  *In re ECHR*, CJEU Op. 2/13 ¶ 201 (Hindelang Decl. Ex. 29).  Thus, treaty provisions that "concern two Member States . . . cannot apply in the relations between those States if they are found to be contrary to the rules of the [EU Treaties]."  *Budějovický Budvar*, CJEU Case No. C-478/07, ¶ 98 (Hindelang Decl. Ex. 24).

The EU Court of Justice is the supreme judicial authority on EU law.  Hindelang Decl. ¶ 38.  It has exclusive jurisdiction to determine the content, scope, and application of the EU's foundational documents.  *Id.*  It is composed of twenty-seven judges, one from each Member State.  TFEU, Art. 253.  The EU Treaties oblige the Member States to support the jurisdiction of the EU Court of Justice and require they do nothing to circumvent or hamper its authority.

The EU Treaties implement a regime to ensure the Court of Justice alone is empowered to interpret EU law.  *See* Hindelang Decl. ¶ 38.  This principle of autonomy is fundamental to the legal order of the European Union, and the EU Treaties protect that principle in two ways.  *First*, Article 267 of the TFEU requires that the highest national court of each Member State "shall" refer questions on EU law to the EU Court of Justice for a preliminary ruling.  The EU Court of Justice's decision is "binding on the national court," which is further "required to do everything

necessary to ensure that that interpretation of EU law is applied." *Puligienica Facility*, CJEU Case No. C-689/13, ¶¶ 37–38, 42 (Hindelang Decl. Ex. 33). *Second*, Article 344 of the TFEU forbids EU Member States from submitting "a dispute concerning the interpretation or application of the Treaties [EU law] to any method of settlement other than" their national courts. As a result, EU Member States lack authority to establish dispute-resolution bodies, including arbitral tribunals that might be called upon to interpret or apply EU law outside the EU judicial system. *In re ECHR*, CJEU Op. 2/13 ¶¶ 212–13.

### 2. The impermissibility of international arbitration by Member States concerning matters of EU law.

Consistent with these foundational principles of delegated sovereignty under the EU Treaties, the EU Court of Justice, the European Commission, and the European Union itself have consistently opined that Member States may not offer or submit to arbitration that may touch upon matters of EU law.

### a. The ruling of the Court of Justice in *Slovak Republic v. Achmea*

In 2018, the EU Court of Justice issued a seminal decision in *Slovak Republic v. Achmea B.V.*, CJEU Case No. C-284/16, (Hindelang Decl. Ex. 7), which addresses the ability of Member States to submit disputes to international arbitration.

*Achmea* concerned an investment arbitration between the Slovak Republic and a Dutch claimant. The investor initiated proceedings under the dispute-resolution mechanism in a bilateral investment treaty ("BIT") between the Netherlands and the Slovak Republic, by which each state made a standing offer to arbitrate disputes with investors of the other state. *Achmea* ¶ 6. The treaty was signed in 1991. On May 1, 2004, the Slovak Republic became a member of the EU, thereby ceding sovereignty to the EU and binding itself to comply fully with EU law. *Id.* In 2008, the Dutch company initiated arbitration under the BIT. *Id.* ¶ 9. The Slovak

Republic objected to the tribunal's jurisdiction, arguing that its accession to the EU rendered the arbitration clause invalid and unenforceable.  *Id*. ¶¶ 11, 14.  The tribunal disagreed, exercised jurisdiction in the case, and eventually rendered an award in favor of the investor.  *Id*. ¶ 12.

The Slovak Republic moved to set aside the award at the arbitral seat in Germany, arguing that the treaty's dispute-resolution mechanism was invalid under EU law and therefore could not be exercised by the national of another EU Member State.  Recognizing that the case presented a question of EU law, the German court referred the case to the EU Court of Justice for a preliminary determination.  The Court of Justice assigned the case to its Grand Chamber for hearing[3] and received submissions from the parties, the European Commission, and sixteen EU Member States.

After deliberation, the Court issued a unanimous opinion:  The EU Treaties "preclud[e] a provision in an international agreement concluded between Member States, such as Article 8 of the [applicable bilateral investment treaty], under which an investor from one of those Member States may . . . bring proceedings against [another] Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."  *Achmea* ¶ 62.  The Court of Justice's reasoning is straightforward:  Under the EU Treaties, Member States lack authority to submit disputes that may require the interpretation of EU law to adjudication outside the judicial system of the European Union (e.g., to arbitral tribunals).  Thus, any putative offer to arbitrate such disputes was void *ab initio*.  Hindelang Decl. ¶ 46.

On remand, the German Federal Court of Justice was presented with the same question as this Court:  whether the arbitral award was enforceable following *Achmea*.  *See* Hindelang Decl.

---

[3]  The EU Court of Justice ordinarily sits in panels of three or five judges.  Significant cases are assigned to a Grand Chamber of fifteen judges, including the Court's President and Vice President.  *See Achmea* ¶ 14; Statute of the Court of Justice, Art. 16 (Hindelang Decl. Ex 21).

¶ 60.  Under German law, an arbitral award will not be enforced if "the arbitration agreement is not valid" or "absen[t]" under the applicable law.  *Achmea*, Case No. I ZB 2/15, ¶ 15 (Nov. 8, 2018) (Hindelang Decl. Ex. 8).  The German court observed that the claimant attempted to create an arbitration agreement through Article 8 of the BIT, which appears to "contain[] an offer by the contracting states to conclude arbitration agreements with investors" of the other state.  *Id.* ¶ 17.  But under EU law, the Slovak Republic lacked the ability to make a legally binding offer to arbitrate:  "by acceding to the [European] Union, the member states have restricted their international powers . . . and have waived among themselves the exercise of international contractual rights that conflict with Union law."  *Id.* ¶ 41.  *Achmea* held that the BIT's arbitration clause conflicts with EU law.  Thus, the German court held that "[*t*]*here is therefore no offer* to conclude an arbitration agreement" in the BIT.  *Id.* ¶ 28 (emphasis added).  And because there was no valid offer for the claimant to accept, "***there is no arbitration agreement*** in the relationship between the parties."  *Id.* ¶ 14 (emphasis added).

The German court held that the award was unenforceable and dismissed the case.  And the German court is not alone among the European courts:  Just last month, the Paris Court of Appeal relied on *Achmea* and annulled an intra-EU investment award, noting that the putative offer of arbitration in the treaty "cannot be the basis for the jurisdiction of the arbitral tribunal even if [the respondent state] has consented to the arbitration procedure[.]"  *Poland v. CEC Praha*, Op. No. 49/2022 ¶ 69 (Hindelang Decl. Ex. 77).  *Achmea* thus stands for the binding proposition—recognized and enforced across the European Union—that EU Member States cannot make valid offers to arbitrate disputes with nationals of other Member States.

**b.** **The reception of *Achmea* among the European Commission, the European Union, and the Member States**

Following *Achmea*, the European Commission formally notified the European Parliament and the European Council of the Court of Justice's holding, explaining that investors governed by EU law "cannot have recourse to arbitration tribunals established" under investment treaties, including "under the Energy Charter Treaty." *Communication from the Commission to the European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547 (July 19, 2018) ("EC Communication 547") at 26 (Hindelang Decl. Ex. 60).

The European Union, too, has affirmed that *Achmea* means that "as between EU Member States, Article 26 of the ECT is inapplicable . . . and therefore cannot have given rise to a valid arbitration agreement." Amicus Brief of the European Union, ECF No. 30-1 at 20, *Novenergia II – Energy & Environment (SCA) EU v. Kingdom of Spain*, Civ. No. 18-1148 (D.D.C. Sept. 24, 2019) at 20.

Consistent with the Commission's view, nearly all EU Member States have since confirmed their understanding of the EU Treaties—i.e., that an arbitration agreement cannot be formed under multilateral treaties like the ECT that apply between an EU Member State and a national of another Member State.  On January 15, 2019, twenty-two EU Member States, including Spain and the Netherlands, jointly declared that pursuant to *Achmea* an "arbitral tribunal established on the basis of investor-State arbitration clauses" in bilateral investment treaties between EU Member States "lacks jurisdiction, due to a lack of a valid offer to arbitrate." *Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union* (Jan. 15, 2019) (the "Joint Declaration") at 1 (Hindelang Decl. Ex. 9). This declaration was made specifically inclusive of the ECT, under which Petitioners initiated

the underlying proceedings in this case:  "For the Energy Charter Treaty, its systemic interpretation in conformity with the [EU] Treaties precludes intra-EU investor-State arbitration."  *Id.* at 2 n.2.

### c.     The ruling of the Court of Justice in *Moldova v. Komstroy*

On September 2, 2021—eighteen days before Petitioners initiated this action—the Grand Chamber of the EU Court of Justice issued its decision in *Moldova v. Komstroy*.  Hindelang Decl. Ex. 13.  Rather than the bilateral investment treaty that had been at issue in *Achmea*, the Court of Justice confronted the validity of an award arising out of an arbitration conducted under the multilateral Energy Charter Treaty.  In addition to the parties themselves, the Court of Justice accepted submissions from the European Union, the European Commission, and nine Member States, including both Spain and the Netherlands.  *Id.* at 1.

The EU Court of Justice held that the dispute-resolution mechanism in Article 26 of the ECT is incompatible with EU law and thus "not . . . applicable to disputes between a Member State and an investor of another Member State."  *Id.* ¶ 66.  The Court explained that arbitral tribunals lack jurisdiction over such disputes "[i]n the precisely same way as the arbitral tribunal at issue . . . in *Achmea*."  *Id.* ¶ 52.  As decided in *Achmea* and confirmed in *Komstroy*, "a putative offer to arbitrate extended by an EU Member State to an investor from another EU Member State, like Article 26 of the ECT, is rendered inapplicable and cannot be accepted to form an agreement to arbitrate."  Hindelang Decl. ¶ 26.

### d.     The ruling of the Court of Justice in *PL Holdings v. Poland*

Finally, on October 26, 2021, the EU Court of Justice issued its decision in *PL Holdings v. Poland*, completing its trilogy of cases on the validity of intra-EU arbitration.  *See* Hindelang Decl. Ex. 35.  Whereas *Achmea* involved bilateral investment treaties and *Komstroy* involved multilateral treaties, the Court of Justice in *PL Holdings* extended its holding to *ad hoc*

arbitration agreements.  Specifically, the Court of Justice held that EU law "preclud[es] national legislation which allows a Member State to conclude an *ad hoc* arbitration agreement with an investor from another Member State[.]"  *Id.*  Furthermore, the Court of Justice emphasized that such offers to arbitrate are invalid, even when the Member State is a willing participant and fully intends to arbitrate the dispute.  As Prof. Hindelang explains, "with regard to the jurisdiction of an intra-EU investment arbitral tribunal, that a failure to promptly raise issues or objections is immaterial, as it is the very existence of that tribunal which is contrary to the EU Treaties." Hindelang Decl. ¶ 45.

The Court of Justice's holding in *PL Holdings* marks a capstone that echoes, and vindicates, the long-held position of the European Commission, which has "consistently taken the view" that intra-EU investment treaties "are contrary to Union law since they are incompatible with provisions of the Union Treaties and should therefore be considered invalid." European Commission Decision 2015/1470 ¶ 102 (Mar. 30, 2015) ("State Aid Decision 2015/1470") (Hindelang Decl. Ex. 66).  As early as 2006, the EU and several Member States objected that arbitral tribunals lack jurisdiction to hear claims by nationals of EU Member States against other Member States, insofar as those claims address matters of EU law.  *See, e.g.*, *Eastern Sugar B.V. v Czech Republic*, SCC Case No 088/2004, Partial Award (Mar. 27, 2007) at ¶ 119 (Hindelang Decl. Ex. 6); Hindelang Decl. ¶ 20 & n.1.  According to the Court of Justice, they were right.

### 3.    The European Commission's state-aid decision regarding Spain

Arbitral awards that purport to require payment from one Member State to an investor of other Member States conflict with a second aspect of EU law:  Paying such an award without prior approval from the European Commission constitutes unlawful state aid.

The EU Treaties prohibit Member States from granting subsidies to private actors—referred to as "state aid"—that "might disrupt or threaten to distort competition" in any economic sector.  Hindelang Decl. ¶ 88.  The European Commission has the sole authority to permit an EU Member State to pay such subsidies, and it alone is empowered to review and evaluate such measures to determine their legality under EU law.

On November 10, 2017, the European Commission issued a binding decision regarding Spain's regulatory scheme for providing support in the electricity sector.  *See* Decision 2017/7384 (Nov. 10, 2017) ("State Aid Decision 2017/7384") (Hindelang Decl. Ex. 65).  That decision was the result of an independent proceeding commenced on December 22, 2014 by the European Commission regarding Spain's renewable energy policy, in which interested parties, including investors like Petitioners and a trade association representing renewable energy producers, made written submissions.  *See id.* ¶ 1.

The European Commission's decision highlights two aspects of EU law that are relevant here.  *First*, it determined that the subsidies for renewable energy production—the ones that formed the basis of Petitioners' claim in the underlying arbitration—"constitute State aid within the meaning of Article 107(1) TFEU."  *Id.* ¶ 88.  It also determined that Spain's implementation of the subsidy regime, in part because it benefited investors like Petitioners, was "in breach of Article 108(3) TFEU," which governs "all systems of aid existing in [the Member] States."  *Id.* at 34; *see also id.* ¶ 89 ("The aid granted until the adoption of this decision is unlawful aid").

*Second*, observing that investors were bringing claims against Spain under the ECT, the Commission explained that "any compensation which an Arbitration Tribunal were to grant to an investor" in respect of the subsidies that were the subject of Spain's regulatory reforms in the energy sector "would constitute in and of itself State aid."  *Id.* ¶ 165.  As a result, Spain, as an EU Member State, cannot pay any such award without the European Commission's prior review

and authorization.  To dispel any possible misunderstanding on the issue, the European

Commission explained that its decision "is part of Union law" and therefore "binding on

Arbitration Tribunals, where they apply Union law."  *Id*. ¶ 166.  The decision is also binding on

private parties, like Petitioners, who are subject to enforcement actions by the European

Commission if they receive unlawful state aid.

Courts in the European Union decline to enforce arbitral awards when, as here, doing so

would violate State-aid laws.  For example, the Swedish claimants in the *Micula* arbitration

sought to enforce an ICSID award against Romania in the courts of Luxembourg, Sweden, and

Belgium.  Hindelang Decl. ¶ 97.  "The Brussels Court of Appeal stayed the enforcement of the

award and referred questions on the lawfulness of its enforceability under the EU law to the EU

Court of Justice."  *Id.*  "[T]he Luxembourg Court of Appeal and the Swedish Nacka District

Court refused to enforce the award because to do so would violate EU law on State aid."  *Id.*

None of the courts was willing to enforce the awards in violation of EU law.

### 4.    The Energy Charter Treaty

The Energy Charter Treaty is a multilateral investment treaty among fifty-three contracting

parties, including Spain, the EU and many of its Member States, and certain Eurasian states.  *See*

Hindelang Decl. ¶ 18.  The United States is not a signatory.  The ECT provides for resolution of

disputes through arbitration under various arbitral rules, including the Arbitration Rules of the

United Nations Commission on International Trade Law ("UNCITRAL").  In this case, the

contracting parties agreed that the Tribunal would decide the dispute in accordance with the ECT

"and applicable rules and principles of international law," including EU law.  ECT, Art. 26(6).

### C.      The Arbitration

On November 16, 2011, Petitioners and several co-claimants commenced arbitration against Spain, purportedly invoking the dispute-resolution provision under Article 26 of the ECT.  Pet. ¶ 13.  A three-member arbitral tribunal was constituted on May 1, 2012.  *Id.* ¶ 14.

Petitioners' claims arose from their investment in Spain's energy sector.  The merits of the dispute center on Spain's right to create, regulate, and modify subsidies for renewable-energy producers operating in Spain.  For many years, Spain has supported the development of renewable-energy production in accordance with its own national interests, its international commitments, and the EU's commitment to producing clean energy and reducing greenhouse gases.  Award ¶ 181 *et seq*.  To further these objectives, Spain enacted legislation that created a special incentive regime to encourage the production of renewable energy.  *Id.* ¶¶ 182–212. Subsequently, and in parallel with the international financial crisis that began in 2008, Spain adopted new legislation to address unsustainable growth in the tariff deficit, which resulted from the special subsidized regime and a drop in demand for electricity, among other factors.  *Id.* ¶ 308(b).  Petitioners claimed these energy-sector reforms negatively affected their investments in Spain and violated several provisions of the ECT.

From the outset of the arbitration, Spain objected to the tribunal's jurisdiction on the ground that the arbitration provision of Article 26 of the ECT does not apply to disputes between an EU Member State and investors of another EU Member State (i.e., "intra EU-disputes").  Jx. Dec. ¶ 36.  Spain explained that the proper process for resolving these intra-EU disputes was to seek relief before a court or tribunal that is a part of the EU's judicial system, which would ensure final recourse to the EU Court of Justice and compliance with EU Treaties.  *Id.* ¶ 132– 135.  And, indeed, the courts of the Member States are available fora for resolving Petitioners' claims.  *See* Hindelang Decl. ¶ 56.

The Tribunal issued its Award on February 28, 2020.  The Tribunal found that Spain violated certain obligations under the ECT by modifying the subsidy scheme and frustrating Petitioners' legitimate expectations regarding the profitability of their investment.  The Award purports to require Spain to pay EUR 15.4 million plus interest to AES Solar Energy Coöperatief and EUR 11.1 million to Ampere Equity Fund B.V.  Award ¶ 909(b).

Rather than seeking to enforce the Award against Spain in Europe, the most natural place for enforcement against a European sovereign, Petitioners sought relief from this Court on December 10, 2021.  ECF No. 1.

## STANDARD OF REVIEW

Spain moves to dismiss the Petition for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  When ascertaining jurisdiction under Rule 12(b)(1), "a court is not limited to the allegations in the Petition, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case."  *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (collecting cases), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006).  "Because subject matter jurisdiction focuses on the Court's power to hear a claim, however, the Court must give the plaintiff's factual assertions closer scrutiny when reviewing a motion to dismiss for lack of subject matter jurisdiction" and "no presumption of truthfulness applies to the factual allegations" in the Petition.  *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 231–32 (D.D.C. 2007) (internal quotation marks omitted).  "The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence."  *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Spain also raises the affirmative defense of foreign sovereign compulsion under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 12(b)(6), the Court must accept well-pleaded allegations in the Petition as true, but need not accept asserted inferences or conclusory

14

allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may also consider

documents that are "referred to in the Petition" or are "central to plaintiff's claim." *Vanover v.*

*Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (considering materials produced and pleadings

submitted in underlying administrative proceeding), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002). The

Court may grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense

"when the facts that give rise to the defense are clear from the face of the Petition." *Smith-*

*Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

**ARGUMENT**

**I.      THE PETITION FAILS FOR LACK OF SUBJECT-MATTER JURISDICTION.**

This action should be dismissed for lack of subject-matter jurisdiction. As a sovereign

state, Spain is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"),

which provides the sole basis for obtaining jurisdiction over a foreign state in federal court. *See*

*Permanent Mission of India to the U.N. v. City of New York*, 551 U.S. 193, 197 (2007). Under

the FSIA, a foreign state is "presumptively immune from the jurisdiction of United States

courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

The FSIA specifies certain exceptions, but "[i]n the absence of an applicable exception,

the foreign sovereign's immunity is complete—[t]he district court lacks subject matter

jurisdiction over the plaintiff's case." *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491

F.3d 470, 474 (D.C. Cir. 2007) (alterations in original) (internal quotation marks omitted).

"Because 'subject matter jurisdiction in any such action depends on the existence of one of the

specified exceptions to foreign sovereign immunity' laid out in the FSIA, as a 'threshold' matter

in every action against a foreign state, a district court 'must satisfy itself that one of the

exceptions applies.'" *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 150–51

(D.D.C. 2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983)).

Petitioners have asserted two exceptions to foreign sovereign immunity under Section 1605(a)(6), the arbitration exception, and Section 1605(a)(1), the waiver exception. Pet. ¶¶ 5, 6. Neither applies in this case.

### A.    The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply.

The arbitration exception provides that a foreign sovereign is not immune to jurisdiction in an action to enforce "an award made pursuant to [ ] an agreement to arbitrate . . . governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards[.]" 28 U.S.C. § 1605(a)(6). The exception does not apply because there was no agreement to arbitrate.

Where parties "'disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute'" on its own accord and without reliance on the underlying decision of the tribunal because "if there was never an agreement to arbitrate, there is no authority to require a party to submit to arbitration." *Nat'l R.R. Passenger Corp. v. B&M Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988) (quoting *Bhd. of Teamsters Loc. No. 70 v. Interstate Distrib. Co.*, 832 F.2d 507, 832 (9th Cir. 1987)); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 530 (2019) ("the court determines whether a valid arbitration agreement exists").

### 1.    Under EU law, there was no agreement to arbitrate.

As an initial matter, the ECT is not an arbitration agreement. In this respect, investment treaties are distinct from more-common arbitration clauses in commercial agreements. Unlike such contracts, the investor is not a party to the treaty. Rather, investment treaties that provide for arbitration contain a standing offer by states to arbitrate disputes that investors can later accept when a dispute arises. *See Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 n.3 (D.C. Cir. 2015) (explaining that the bilateral investment treaty between the United States and Ecuador is not an ordinary contract between private parties, but rather "includes a standing offer

to all potential U.S. investors to arbitrate investment disputes, which [the claimant] accepted in the manner required by the treaty").

There was no agreement to arbitrate because EU law precludes Spain from making an offer to arbitrate matters that may require the interpretation or application of EU law where, as here, the putative claimants are nationals of EU Member States.  Under *Achmea*, *Komstroy*, and *PL Holdings*, a Member State's putative offer to submit to arbitration under a treaty that removes jurisdiction from the courts of Member States is void *ab initio*.  Hindelang Decl. ¶¶ 46, 61.  The Member States cannot make offers to arbitrate claims against nationals of other Member States; they lost that ability when they acceded to the EU.

In this case, it is undisputed that the ECT removes disputes from the jurisdiction of EU courts; that is the very nature of arbitral process.  It is undisputed that the Tribunal understood itself to be adjudicating a dispute between one Member State and nationals of another.  And it is undisputed that the Tribunal was called upon to resolve "disputes which may concern the application or interpretation of EU law."  *Achmea* ¶ 55.  Under the ECT, the contracting parties agreed that an arbitral tribunal is bound to decide the dispute in accordance with the ECT "and applicable rules and principles of international law."  ECT, Art. 26(6).  The EU Treaties are international law.  Hindelang Decl. ¶ 78.  As the Court of Justice held in *Achmea*, *Komstroy*, and *PL Holdings*, Member States cannot make valid offers to arbitrate with investors of other Member States under the national legislation, bilateral investment treaties, or multilateral treaties, including the ECT.

## 2. The EU's interpretation of its own law is binding on the Court.

The views of the EU Court of Justice, the European Union and its Members States, and the European Commission on matters of EU law and the ECT are binding rules of decision on this Court.

*First*, the EU Court of Justice has final authority to interpret EU law.  Under EU law, the Court of Justice has the authority to determine the scope of Member States' ability to enter into arbitration agreements.[4]  The Court of Justice has exercised its authority under the EU Treaties to declare incompatible with EU law—i.e., unconstitutional—arbitration provisions in international agreements like the ECT.  The Court must follow that decision.  *Al Tech Specialty Steel Corp. v. United States*, 28 Ct. Int'l Trade 1468, 1503 (C.I.T. 2004) (affording conclusive weight on the issue of EU law to a decision of the EU Court of Justice); *see also Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (analogizing the process of determining foreign law to the rules for ascertaining state law, and observing that the decisions of a state's highest court are "binding on the federal courts" in deciding the content of state law).

*Second*, the Court must give deference to the interpretation of the ECT reached by the European Union and its Member States.  Where parties to a treaty "agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [a court] must, absent extraordinarily strong contrary evidence, defer to that interpretation."  *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982); *see also Medellin v. Texas*, 552 U.S. 491, 507 (2008) ("'postratification understanding' of signatory nations" to a treaty aids its interpretation); *Air France v. Saks*, 470 U.S. 392, 404 (1985) ("we find the opinions of our sister signatories to be entitled to considerable weight" in interpreting treaties).  Such deference is particularly compelling where, as here, the United States is not a party to the treaty at issue.

---

[4]  That should not be surprising.  The U.S. Constitution contains similar restrictions limiting the validity of agreements between states:  "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State[.]"  U.S. Const., art. I, § 10, cl. 3.

\* \* \*

The fact that there was no agreement to arbitrate—and that the Award is therefore unenforceable—should come as no surprise to Petitioners.  When they chose arbitration under the ECT in 2011, Petitioners were on notice of these jurisdictional risks.  Member States and the European Commission had publicly objected to the validity of such arbitration provisions since at least 2006.  The EU Court of Justice's later decisions in *Achmea* and *Komstroy* merely confirmed that they had been right all along.

Petitioners' choice of arbitration was motivated, no doubt, by hopes of avoiding such jurisdictional objections—and in that regard, it was unsurprisingly successful.  Arbitral tribunals routinely deny challenges to their own jurisdiction.[5]  In this case, the Tribunal saw itself as the organ of an independent legal order, declining to consider the Court of Justice's *Achmea* decision on matters of EU law.  *See* Decision of the Swiss Court, Rozen Decl. Ex. C, ECF No. 1-2 at 439. That was, of course, a mistake:  Tribunals derive their power exclusively from the agreement of the parties.  And the decision of an arbitral tribunal constituted without such agreement has no legal effect.  Plaintiffs' forum shopping has now left them without an enforceable award.  But that is their burden.  Plaintiffs could have pursued their claims against Spain in any of the EU courts, *see* Hindelang Decl. ¶ 56, just as EU law requires.[6]

## B.    The "Waiver Exception" in Section 1605(a)(1) Does Not Apply.

Petitioners also argue that Spain is not entitled to immunity from this Court's jurisdiction because it waived that immunity by becoming a party to the New York Convention.  Pet. ¶ 5.

---

[5]  Perhaps because, as Prof. Hindelang observes, "intra-EU investment arbitration accounts for roughly twenty percent" of the market, "which would instantly disappear if the intra-EU objection is accepted."  Hindelang Decl. ¶ 27 n.14.

[6]  Unless the Court separately dismisses the Complaint under the doctrine of *forum non conveniens*, *see* Part V *infra*, the Court must resolve the question of subject-matter jurisdiction

Section 1605(a)(1) of the FSIA provides that "[a] foreign state shall not be immune" when "the foreign state has waived its immunity either explicitly or by implication[.]"  Spain did not waive its immunity, either explicitly or impliedly.

*First*, Spain did not expressly waive immunity.  "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity."  *World Wide Minerals, LTD v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002).  Plaintiffs do not attempt to identify any text in the Convention that would effect an explicit waiver—and there is none.  To the contrary, the Convention expressly preserves the signatories' sovereign immunity.

*Second*, Spain did not impliedly waive immunity.  The D.C. Circuit has observed that "[t]he FSIA does not define 'implied waiver'" and instructs that the implied waiver provision must therefore be construed "narrowly."  *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999).  In particular, the D.C. Circuit has held that an implied waiver requires that "the foreign state . . . intended to waive its sovereign immunity."  *Id.*  Circumstances for implied waiver are few.  The D.C. Circuit has recognized only three: where "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity."  *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990).

---

before considering the merits.  That is because the Court "must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible."  *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000).  "[T]o defer the question is to 'frustrate the significance and benefit of entitlement to immunity from suit.'"  *Id.*  Importantly, Spain has the "right to take an immediate appeal" for denial of immunity under the collateral-order doctrine.  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (collecting cases).

The second and third circumstances do not apply; there is no contract, and Spain has raised the defense of sovereign immunity in this pleading.  Instead, Petitioners argue that Spain's general accession to the New York Convention constitutes a specific waiver as to this dispute.  It does not.  Petitioners sole argument for such waiver relies on *dicta* from the D.C. Circuit opinion in *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118 (D.C. Cir. 1999).  There, the court quoted favorably from the Second Circuit's decision "in *Seetransport*, [where it] reasoned, correctly we think, that 'when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states.'"  *Creighton Ltd.*, 181 F.3d at 123 (D.C. Cir. 1999) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993)).

Petitioners' reliance on *Creighton* is misplaced for at least two reasons.  *First*, the D.C. Circuit admonished just this year that "[a]lthough we have favorably cited *Seetransport* and its reasoning in dicta and in an unpublished opinion, we have not formally adopted it."  *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 774 (D.C. Cir. 2022).[7]  The court declined even to consider the *Seetransport* waiver argument, noting "the murky waters of the waiver exception" and the potential "implications for the treatment of the United States in foreign courts and for our relations with foreign states" if such a waiver rule were adopted.  *Id.* n.3.  *Seetransport* is not the law in this District, and the D.C. Circuit has cautioned against it.

*Second*, even if *Seetransport* were good law, it would not apply to this case.  *Seetransport* was a commercial arbitration based on contract, and the contract contained an arbitration clause pursuant which the parties had uncontestedly agreed to arbitrate their present dispute.  989 F.2d

---

[7]  The "unpublished opinion" is *Tatneft v. Ukraine*, 771 F. App'x 9 (D.C. Cir. 2019).

at 574 ("Pursuant to Article XIII of the Contract of Sale, the parties submitted their disputes to arbitration . . ."). Thus, *Seetransport* proposes a rule pursuant to which "the waiver exception applies if the foreign sovereign [(i)] is a party to the New York Convention and [(ii)] has agreed to arbitrate in a Convention state." *P&ID*, 27 F.4th at 774. That is consistent with the Second Circuit's discussion of "the legislative history of § 1605(a)(1), which states, 'with respect to implicit waivers, the courts have found such waivers in cases ***where a foreign state has agreed to arbitration in another country***[.]" *Seetransport*, 989 F.2d at 577 (quoting H.R. Rep. No. 1487, 94th Cong., 2d Sess. 18). Because Spain did not agree to arbitrate Petitioners' claims, there can be no waiver of its sovereign immunity.[8]

## II.  THE COURT SHOULD REFUSE ENFORCEMENT UNDER THE NEW YORK CONVENTION.

If the Court were to find jurisdiction, it should nonetheless decline to enforce the Award. Under the New York Convention, the "may refuse to enforce the award" on any of the grounds enumerated in Article V. *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007); *see also* 9 U.S.C. § 207 (implementing Article V). One of those grounds applies here: "The parties to the [arbitration] agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid . . ."). *See* New York Convention, 21 U.S.T. at 2560. The EU Court of Justice has held that Spain lacked the capacity to make an effective

---

[8] Unless the Court separately dismisses the Complaint under the doctrine of *forum non conveniens*, *see* Part IV *infra*, the Court must resolve the question of subject-matter jurisdiction before considering the merits of Petitioners' case. That is because the Court "must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible." *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). "[T]o defer the question is to 'frustrate the significance and benefit of entitlement to immunity from suit.'" *Id.* Importantly, Spain has the "right to take an immediate appeal" for denial of immunity under the collateral-order doctrine. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (collecting cases).

offer to arbitrate a dispute with investors from another Member State.  Thus, there was no offer for Petitioners to accept and no valid agreement to arbitrate.  *See* Part I.A *supra*.

## III.   THE PETITION SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE.

Under the foreign sovereign compulsion doctrine, a U.S. court should refrain from entering an order that would compel a party to act in contravention of the laws of a foreign sovereign.  The D.C. Circuit instructs that "[p]rinciples of international comity require that domestic courts not take action that may cause the violation of another nation's laws."  *F.T.C. v. Compagnie de Saint-Gobain-Pont-à-Mousson*, 636 F.2d 1300, 1327 n.150 (D.C. Cir. 1980); *see also In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir. 1987) ("We have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders.").  The doctrine thus provides a "foreign party" with "protection from being caught between the jaws of [a U.S. court] judgment and the operation of laws in foreign countries."  Restatement of the Foreign Relations Law of the United States 3d § 441 (1987), reporters' notes 1.

The EU is a sovereign entity; it makes law and issues judgments to which Spain is subject.  Ordering Spain to comply with the Award would violate EU law in two ways: *First*, *Achmea* holds that investment arbitration that may require the interpretation or application of EU law is incompatible with EU law.  Ordering Spain to comply with the Award would require Spain to recognize and validate an arbitration that contravenes EU law.  *Second*, ordering Spain to pay a judgment resulting from the Award would require Spain to make unlawful payments in violation of EU state-aid law because the European Commission has not authorized its payment.

For purposes of this case, the Court is bound by the EU Court of Justice decision and the pronouncements of the European Commission.  The acts of foreign sovereigns become "a

principle of decision binding on federal and state courts alike."  *W.S. Kirkpatrick & Co. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990).  This is not a "vague doctrine of abstention." *Id.*  The court may not "question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts."  *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).  The Petition must therefore be dismissed under Federal Rule of Civil Procedure 12(b)(6).

## IV.    IN THE ALTERNATIVE, THE PETITION SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.

The legal arguments above are dispositive of this case.  Settled EU law demands that the Court dismiss the Petition.  But if there were any question about EU law and its application to this case, then the Court should dismiss under the doctrine of *forum non conveniens*.[9]

Courts may dismiss an action where "(1) there is an available and adequate alternative forum, and (2) the balance of various public and private interest factors indicates that maintaining the case in the current forum is comparatively inconvenient."  *In re Air Crash Over S. Indian Ocean*, 352 F. Supp. 3d 19, 35 (D.D.C. 2018) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Both elements are readily established in this case.

*First*, the judicial system of the European Union provides adequate fora.  A "foreign forum is available and adequate when it provides the plaintiff with some remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized."  *In re Air Crash*, 352 F. Supp. 3d at 36 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 255 (1981)).  Under the UNCITRAL

---

[9]  The Court may dismiss under *forum non conveniens* without first resolving questions of its jurisdiction.  *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).

Rules, a claimant can seek enforcement of a valid award in any contracting state (subject to available defenses, *see* Part IV *supra*). Petitioners cannot dispute that Spain and the Netherlands are available fora (among others). If the Award were enforceable, the ordinary place to find Spanish assets is in Spain. *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011) ("Where adequacy of an alternative forum is assessed in the context of a suit to obtain a judgment and ultimately execution on a defendant's assets, the adequacy . . . depends on whether there are some assets of the defendant in the alternate forum, not whether the precise asset located here can be executed upon there.").

*Second*, the *Gulf Oil* factors favor dismissal. "The public interest factors to consider are the desirability of clearing foreign controversies from congested dockets, the extent of any local interest in resolving the controversy, and the ease with which the present forum will be able to apply the laws of an unfamiliar jurisdiction." *Atl. Tele-Network v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126, 137 (D.D.C. 2003). This District has ten pending actions against Spain alone, all of which involve the enforcement of international arbitral awards. Dozens of arbitrations involving nationals of EU Member States are pending before ICSID tribunals,[10] cases which will surely find their way to this District if it offers a divergent—and more favorable—interpretation of EU law.[11] The United States has no interest in resolving matters of EU law, particularly as applied to a treaty to which the United States is not a party.

---

[10] *See* ICSID Case Database, *available at* https://icsid.worldbank.org/en/Pages/cases/Advanced Search.aspx

[11] *See, e.g.*, *Masdar Solar & Wind Coop. U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 36 (D.D.C. 2019) (expressing reservations in "resolving a thorny dispute over the implications of multiple treaty obligations and a shifting legal landscape in the European Union" and noting that "considerations of comity are particularly resonant here, given that resolving this case mandates addressing a conflict between decades-old treaties and newly minted EU case law").

Indeed, Petitioners have flocked to this District in hopes of evading the straightforward application of EU law.  If they prevail, they will create a conflict between the U.S. courts and the EU Court of Justice on matters of EU law.  That is precisely the kind of conflict that principles of international comity instruct courts to avoid.  *Nygard v. DiPaolo*, 753 F. App'x 716, 728 (11th Cir. 2018) ("[T]he possibility of inconsistent rulings with foreign countries raises international comity concerns that should be considered in the forum non conveniens analysis.").  Petitioners' choice of forum is entitled to little deference when the dispute has no connection to the forum.  *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 605 (D.C. Cir. 1983); *Irwin v. WWF, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006).  Petitioners' choice of forum should be viewed with even more skepticism when it is predicated on a patent interest in avoiding the application of foreign law in the proper forum.  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) ("the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference [it] commands").

Consistent with that view, other courts have dismissed actions against foreign sovereigns under the doctrine.  *See In Re Monegasque de Réassurance S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002) (affirming the district court's dismissal of an enforcement action against a Ukrainian state-owned company for *forum non conveniens* where the litigation had no connection to the United States); *Figueiredo Ferraz e Enghenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) (reversing the district court and ordering dismissal for *forum non conveniens* of an enforcement action where a Peruvian judgment-cap statute had a direct impact on Peru's ability to pay an arbitral award).

The D.C. Circuit imposes one limited restriction on the *forum non conveniens* doctrine in the context of the FSIA, which does not apply to the circumstances here.  In *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), the petitioner sought to render an

arbitral award into a domestic judgment in order to attach property that Ukraine's instrumentality in the United States.  *Id.* at 303.  The court held that dismissal under *forum non conveniens* was improper because a "court of the United States" is the only available forum for an action to "attach the commercial property of a foreign nation located in the United States."  *Id.*[12]

      This case presents a different issue.  *TMR Energy* addressed a later stage of the enforcement proceedings, where the live issue was which fora were available for attached commercial assets within the United States.  That only occurs after the court's jurisdiction had been established—notably, the respondent in that case **did** "**not dispute** that [the] case [came] within . . . the exception to immunity for any action brought to confirm an arbitration award" under Section 1605(a)(6) of the FSIA.  *TMR Energy*, 411 F.3d at 324 (emphasis added).  By contrast, Spain vigorously contests the Court's jurisdiction.  The Court's jurisdiction must be resolved as a threshold matter—and thus well before the issue of attachment and enforcement in *TMR Energy* become relevant.  The District of Columbia is an inconvenient forum to resolve the predicate question to attachment:  whether Petitioners can establish a valid arbitration agreement to deprive Spain of its sovereign immunity.  Resolution of that question is not proper in this forum because of the complicated issues of European Union and international law, none of which was present in *TMR Energy*.  At a theoretical later stage, Spain agrees the United States is the only jurisdiction in which to execute a judgment against assets in the United States.[13]

---

[12]  *See also Tatneft v. Ukraine*, 21 F.4th 829, 840 (D.C. Cir. 2021).

[13]  Spain notes, however, that the location of such assets does not make the United States the *only* available forum for Plaintiffs' enforcement action.  "[I]t is well established that the availability and the adequacy of a forum does not turn on whether exactly the same remedy that exists in the United States is available in the foreign forum."  *Southern Indian Ocean*, 352 F. Supp. 3d at 38. A foreign forum need only provide the plaintiff "with *some* remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized."  *Id.* at 37.

Any broader reading of *TMR Energy* would render *forum non conveniens* functionally inapplicable to any case that falls under the enforcement provisions of the FSIA.  But that cannot be the case.  As the D.C. Circuit explains: "the doctrine of *forum non conveniens* remains fully applicable in FSIA cases."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 100 (D.C. Cir. 2002); *Simon v. Republic of Hungary*, 911 F.3d 1172, 1182 (D.C. Cir. 2018).

## CONCLUSION

For these reasons, Spain respectfully requests the Court enter an order dismissing the Petition for lack of subject-matter jurisdiction; dismissing the Petition under the doctrine of *forum non conveniens*; or denying Petitioners' claims on the merits under either the foreign sovereign compulsion doctrine or the New York Convention.

Dated:  May 6, 2022

Respectfully submitted,

   */s/ Jonathan M. Landy*

Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel.:    (202) 434-5000
Fax:     (202) 434-5029
Email:   jlandy@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2022, I caused the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants.

   */s/ Jonathan M. Landy*   
Jonathan M. Landy
