# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **BLASKET RENEWABLE INVESTMENTS, LLC,**[1] | ) ) ) | |
| **Petitioner,** | ) ) | |
| **v.** | ) ) | **Civil Case No. 21-3249 (RJL)** |
| **THE KINGDOM OF SPAIN,** | ) ) | |
| **Respondent** | ) ) | |

## MEMORANDUM OPINION
March 29, 2023 [Dkt. ## 15, 40]

In 2007, two Dutch companies, AES Solar Energy Coöperatief U.A. and Ampere Equity Fund B.V. (collectively, the "Companies"), invested in renewable energy projects in order to take advantage of favorable tax incentives offered by the Kingdom of Spain ("Spain"). However, in the wake of the 2008 financial crisis, Spain implemented reforms in its energy sector that had the effect of reducing the value of the Companies' investment. The Companies invoked the arbitration provision of the Energy Charter Treaty, to which both Spain and the Netherlands are signatories, and were awarded compensation for their losses by an arbitral tribunal seated in Switzerland. The Companies have petitioned this Court to confirm their award. Spain has moved to dismiss the petition on multiple grounds,

---

[1] Blasket Renewable Investments LLC has been substituted as petitioner in this action in place of AES Solar Energy Coöperatief, U.A. and Ampere Equity Fund, B.V. *See* Minute Order of March 7, 2023.

including a lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act. Because Spain's standing offer to arbitrate was void as to the Companies under the European Union law to which both Spain and the Companies are subject and which applied to the dispute by the terms of the Energy Charter Treaty itself, no valid agreement to arbitrate exists, and this Court therefore lacks the subject matter jurisdiction necessary to confirm the tribunal's award.  Accordingly, I will **GRANT** Spain's motion [Dkt. # 15] and dismiss the petition.

## BACKGROUND

### I.    Factual Background

This case arises from a dispute between Spain and the Companies regarding the validity of an arbitration provision of the Energy Charter Treaty ("ECT") as applied to disputes between Member States of the European Union ("EU") and investors of other EU Member States.

The ECT is a multilateral treaty intended to promote investment in energy and thereby encourage economic growth.  *See* Energy Charter Treaty ("ECT"), Pet. to Enforce Arbitral Award Ex. 3 [Dkt. # 1-3].  Spain and the Netherlands are both signatories.  *See* Signatories/Contracting Parties, Energy Charter Treaty, https://www.energychartertreaty.org/treaty/contracting-parties-and-signatories/.   Other than Italy, which withdrew in 2016, every other EU Member State and the EU itself are also signatories to the ECT.  *Id.*  The United States is not a signatory.  *Id.*  Among other things, the ECT obligates signatories to protect investments in their domestic territories made by investors from other signatory

states. *See, e.g.*, ECT art. 10(1). The ECT provides an enforcement mechanism to protect such cross-border investments by establishing a framework to resolve disputes between foreign investors and governments in Article 26. *Id.* art. 26. That article provides that any arbitral tribunal established under its authority "shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law." *Id.* art. 26(6).

The underlying dispute in this case relates to investments made by the Companies in Spain in reliance on economic incentives provided by Spanish legislation. In short, Spain enacted legislation at various times prior to 2010 creating economic incentives for firms to invest in certain renewable energy projects in Spain. Final Award ("Award") [Dkt # 1-2] ¶¶ 189–95. The Companies relied on those programs for investment in Spanish projects. Beginning in 2010, however, Spain rescinded those incentives, harming the Companies by reducing the value of their investments. *Id.* ¶¶ 199–207.

Not surprisingly, the Companies invoked their right to arbitration under Article 26 of the ECT in 2011. Rozen Decl. Ex. B, Preliminary Award on Jurisdiction ("Prelim. Award") [Dkt. #1-2] ¶ 11. The arbitral panel, which was seated in Switzerland and convened under the auspices of the United Nations Commission on International Trade Law ("UNCITRAL"), found that it had jurisdiction over the dispute in 2014 and issued an award in favor of the Companies in 2020. *Id.* ¶ 375(a); Award ¶¶ 847, 909(b). Spain challenged the award before the Swiss Federal Supreme Court, which dismissed the challenge and confirmed the award in 2021. Bundesgericht [BGer] [Federal Supreme

Court] Feb. 23, 2021, 4A_187/2020, slip op. at 11-12 (Switz.).  That award is now final and not subject to further challenge in Switzerland.

The Netherlands and Spain, of course, are also members of the EU.  The EU is a supra-national organization comprising 27 countries, referred to as EU Member States. Decl. of Professor Steffen Hindelang ("First Hindelang Decl.") [Dkt. # 15-2] ¶ 30.  Each EU Member State retains its sovereignty, but EU Member States are *prohibited* from violating EU law.  *Id.*  This legal rule is referred to as the principle of "primacy" in EU law.  *Id.*  The ultimate sources of EU law are the Treaty of European Union ("TEU") and the Treaty on the Functioning of the European Union ("TFEU"), collectively referred to as the EU Treaties.  *Id.*¶¶ 30–31.  Every EU Member State, including Spain and the Netherlands, has signed and ratified both the TEU and the TFEU as a necessary precondition of membership.  *Id.* at 30.  Among other things, the EU treaties establish the institutions of the EU and delineate powers between the EU itself and its Member States and among the EU institutions.  *See Id.*

One of the EU institutions established by those treaties is the Court of Justice of the European Union ("CJEU").  *See id.* ¶ 38.  The CJEU is analogous to the Supreme Court in the United States' legal system in that it is the final arbiter of questions of EU law under the EU Treaties.  *Id.* ¶ 20.  Spain's legal arguments in this case are derived from a series of decisions by that court interpreting EU law as it pertains to the validity of agreements to arbitrate between EU entities.

In 2018, the CJEU invalidated an arbitral award issued against the Slovak Republic issued under the authority of a Bilateral Investment Treaty ("BIT") between that country

and the Netherlands in a case called *Achmea B.V. v. Slovak Republic* ("*Achmea*").   .

*Slovak Republic v. Achmea*, Case C0284/16 (6 March 2018), ECLI:EU:C:108:158, ECF

No. 51-3. The basis for the court's decision is the premise that CJEU is the ultimate arbiter

of EU law under the EU Treaties. As such, the interpretation of EU law by arbitral panels

in cases involving EU Member States creates a risk of inconsistent application of EU law.

*See id.*; *see also* First Hindelang Decl. ¶ 22. Therefore, according to the CJEU, EU Member

States are prohibited from entering into a "treaty by which [it] agree[s] to remove from the

jurisdiction of [its] own courts . . . disputes which may concern the application or

interpretation of EU law." *Achmea* ¶ 55. Doing so would violate the treaty obligations of

EU Member States to uphold "the autonomy of the EU and its legal order." *Achmea* ¶ 57.

Indeed, the CJEU has since extended this analysis to encompass multilateral treaties

containing arbitration agreements in a September 2021 case, *Republic of Moldova v.

Komstroy* ("*Komstroy*"). Case C-741/19 (2 September 2021), ECLI:EU:C:2021:655. In

that case, which addressed the validity of an award issued under the ECT, the CJEU

extended the core holding of *Achmea* to find that arbitration provisions contained in

multilateral treaties are incompatible with EU law insofar as they are applied to disputes

between an EU Member State and a national of another EU Member State. *Id.* ¶52. The

*Komstroy* ruling expressly, and with retroactive effect, invalidated any arbitral award

issued to an investor from an EU Member State (an "EU investor") against another EU

Member State because no EU Member State could make a valid offer to arbitrate such a

dispute under EU law. *Id.* ¶ 66.

## II.    Procedural Background

The Companies filed a petition in this Court to confirm the Award on December 10, 2021, under the authority of the New York Convention.[2]  *See* Petition to Enforce Arbitral Award ("Petition") [Dkt. # 1].  Spain moved to dismiss on May 6, 2022.  *See* The Kingdom of Spain's Mot. to Dismiss the Petition ("Mot. to Dismiss") [Dkt. # 15].  The motion to dismiss has been fully briefed.  *See* Petitioners' Response to Spain's Mot. to Dismiss ("Resp.") [Dkt. # 20]; Reply in Support of the Kingdom of Spain's Mot. to Dismiss the Petition ("Reply") [Dkt. # 23].  With the Court's permission, the European Commission, which is the organ of the European Union responsible for representing the European Union to foreign governments, filed an amicus brief in support of Spain's motion.  *See* Br. for the European Comm'n On Behalf Of the European Union In Support of the Kingdom of Spain ("Amicus Br.") [Dkt. # 19].  I heard oral argument on Spain's motion on October 31, 2022.

Subsequent to that round of briefing, the Companies transferred their interest in the Award issued by the arbitral tribunal to a Delaware firm, Blasket Renewable Investments LLC ("Blasket").  The Companies accordingly moved to substitute Blasket as petitioner under Federal Rule of Civil Procedure 25(c), which Spain opposed.  *See* Mot. for Substitution [Dkt. # 31]; The Kingdom of Spain's Opp. to Petitioners' Mot. for Substitution [Dkt. # 37].  I granted the Companies' motion and ordered Blasket substituted as petitioner on March 7, 2023.  *See* Minute Entry of March 7, 2023; Minute Order of March 7, 2023.

---

[2] The Netherlands, Spain, Switzerland, and the United States are signatories to the New York Convention.  Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (the "New York Convention").

## LEGAL STANDARD

In resolving a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, "a court is not limited to the allegations in the Petition, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (collecting cases), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006). Because subject matter jurisdiction focuses on the Court's power to hear a claim, however, the Court must give the plaintiff's factual assertions closer scrutiny when reviewing a motion to dismiss for lack of subject matter jurisdiction and "no presumption of truthfulness applies to the factual allegations" in the Petition. *Klayman v. Nat'l Sec. Agency*, 280 F. Supp. 3d 39, 50 (D.D.C) (citation omitted).  Finally, the petitioner "bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

## DISCUSSION

Spain has moved to dismiss on four grounds.  *See generally* Mot. to Dismiss.  First, Spain challenges this Court's subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  *Id.* at 15–21.  Second, Spain argues that the Court should refuse enforcement of the Award under the New York Convention.  *Id.* at 22–23.  Third, Spain argues that granting the petition would violate the foreign sovereign compulsion doctrine. *Id.* at 23.  Finally, Spain argues that the entire case should be dismissed under the doctrine

of *forum non conveniens*.[3] *Id.* at 24.  However, because this Court has concluded it lacks subject-matter jurisdiction, I need not reach the merits of Spain's arguments under the New York Convention or the doctrine of foreign sovereign compulsion.

## I.   Subject Matter Jurisdiction – Arbitration Exception

Blasket and the Companies (collectively, "petitioners") contend that this Court has subject matter jurisdiction over this case under the arbitration exception to the FSIA.  28 U.S.C. § 1605(a)(6).  I disagree.  A petitioner seeking to confirm an arbitral award must establish three "jurisdictional facts" to establish jurisdiction: an agreement to arbitrate; an arbitral award; and a treaty governing the award.  *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015).  Petitioners have made that initial showing in the form of the ECT, the Award, and the New York Convention.  *See LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021).  Thus, the "burden shift[s] to [Spain] to demonstrate by a preponderance of the evidence that the [ECT] and the notice to arbitrate did *not* constitute a valid arbitration agreement between the parties." *Chevron*, 795 F.3d at 205 (emphasis added) (citing *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008)).  Because Spain has established by a preponderance of the evidence that it lacked the legal capacity to make a valid offer to arbitrate as to the

---

[3] While the Court can consider Spain's challenge to this Court's authority to hear the case under the doctrine of *forum non conveniens* without first establishing jurisdiction, *see Sinochem Intern. Co. Ltd v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 432 (2007), such a challenge is futile.  Our Circuit Court has "squarely held 'that *forum non conveniens* is not available in proceedings to confirm a foreign arbitral award because only U.S. courts can attach foreign commercial assets found within the United States.'" *Tatneft v. Ukraine*, 21 F.4th 829, 840 (D.C. Cir. 2021) (citation omitted).

Companies under the law that the tribunal should have applied, the ECT was not a valid offer to arbitrate *as to them*.  How so?

Petitioners argue that the Swiss tribunal's determination that a valid agreement to arbitrate existed between Spain and the Companies is binding on this Court.  It is not. Unfortunately for petitioners, Spain's challenge to its legal capacity to extend an offer to arbitrate to the Companies, without which no valid agreement to arbitrate can exist, falls outside the scope of matters entrusted to the arbitrator to resolve.

"[A]rbitration is a matter of contract." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019); *see also B.G. Grp, PLC v. Rep. of Argentina*, 572 U.S. 25, 37 (2014).  Indeed, under our Circuit Court's precedent, treaties containing agreements to arbitrate constitute two independent contracts: a substantive agreement and an agreement to arbitrate (or a standing offer to arbitrate) nested within that larger agreement.  *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015).  It is well established that "challenges specifically [to] the validity of the agreement to arbitrate" are presumptively heard by courts.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46 (2006) (citations omitted); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) ("It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.") (citations omitted).

Guided by those principles, courts in this district have routinely held that challenges to the validity of an arbitration clause on grounds that the parties lacked the legal capacity to form an agreement to arbitrate must be resolved by a court, not an arbitrator.  Deference

to the arbitrator merely presupposes that the party in question both had that capacity and had exercised it to form the arbitration agreement. *See, e.g.*, *Johansson v. Cent. Properties, Inc.*, 320 F. Supp. 3d 218, 221 (D.D.C. 2018) (Contreras, J.); *RDP Technologies, Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 139 (D.D.C. 2011) (Bates, J.); *Amirmotazedi v. Viacom, Inc.*, 768 F. Supp. 2d 256, 262 (D.D.C. 2011) (Kessler, J.).  In the event of a challenge to the validity of the arbitration clause, however, courts in this district, like my colleague Judge Mehta, have declined to defer to the arbitrator's ruling that an agreement to arbitrate existed.  Indeed, he did so in another case challenging the validity of an agreement to arbitrate between an EU Member State and an EU national.  *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265 (D.D.C. 2019).  And our Circuit Court affirmed his authority to reach those questions of foreign law.  *Micula v. Gov't of Romania*, 805 F. App'x 1, 1–2 (D.C. Cir. 2020).

It is true, as the petitioners argue, that this presumption can be overcome in cases where there is "clear and unmistakable" evidence that the parties delegated authority to the arbitrator to resolve challenges to the existence of an arbitration agreement.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up).  As relevant here, one way in which parties may show such clear and unmistakable evidence is to agree to arbitrate under rules that expressly delegate such authority to the arbitrator.  *See Chevron*, 795 F.3d at 207.  And it is true that the ECT provides for arbitration under the International Centre for Settlement of Investment Disputes ("ICSID") and UNCITRAL, both of which contained such a provision *before* the signing of the ECT.  *See* ECT art. 26(4)(a), (b); UNCITRAL Rules, art. 23(1) (1976); ICSID Rules, art. 41 (1966).  Relying on that fact in

a case resolving the same underlying dispute that later reached the CJEU in *Komstroy*, our Circuit Court has already held that a signatory to the ECT has made such a clear showing as required by *First Options*. *See Stileks*, 985 F.3d at 878–89. And that, according to petitioners, should be sufficient. *See* Resp. at 19. Not so!

Petitioners ask the Court, in essence, to follow the path taken by my colleague Judge Chutkan in two recently decided cases applying *Chevron* and *Stileks*. *See* Petitioners' Notice of Supp. Auth. [Dkt. # 30]. In those cases, both of which resolved petitions to enforce arbitral awards issued against Spain under the authority of the ECT, Judge Chutkan rejected the same arguments Spain makes here and found that the petitioners had established jurisdiction under the arbitration exception to the FSIA. *See NextEra Energy Global Holdings B.V. v. Kingdom of Spain*, No. 1:19-cv-1968-TSC, 2023 WL 2016932 at *7 (D.D.C. Feb. 15, 2023); *9Ren Holding S.A.R.L. v. Kingdom of Spain*, No. 1:19-cv-1871-TSC, 2023 WL 2016933 at *6 (D.D.C. Feb. 15, 2023). Both decisions relied on our Circuit Court's decisions in *Stileks* and *Chevron*, finding that those cases held that "[t]he assertion that a party lacked a legal basis to enter or invoke an arbitration agreement is not a challenge to the jurisdictional fact of that agreement's existence but rather a challenge to that agreement's arbitrability." *NextEra*, 2023 WL 2016932 at *7; *9Ren*, 2023 WL 2016933 at *6. I respectfully disagree.

Both *Stileks* and *Chevron* resolved questions about the "scope of arbitrability." In *Stileks*, the parties disagreed whether the specific investment at issue fell within the ambit of the ECT by nature of the type of investment. *Stileks*, 985 F.3d at 878. And in *Chevron*, Ecuador challenged jurisdiction on the grounds that the valid arbitration agreement

contained in a BIT between Ecuador and the United States had not yet come into effect at the time that the investment was made. *Chevron*, 795 F.3d at 206–07. In both cases, our Circuit Court held that the district court before which the petition to enforce the award was brought must defer to the tribunal's determination that the underlying dispute fell within the four corners of the agreement to arbitrate. *See Stileks*, 985 F.3d at 878–79; *Chevron*, 795 F.3d at 207–08. As such, these decisions merely stand for the proposition that a reviewing court must defer to an arbitral tribunal's judgment that a particular investment fell within the scope of an arbitration provision that applies to disputes between two parties to that agreement.

However, neither challenge was predicated on an argument that, under the law applicable to them, the parties were *incapable* of entering into an agreement to arbitrate anything at all. Deference to the tribunal in such a case effectively assumes away the antecedent question of whether the parties could have agreed to do so in the first instance. *See Buckeye Check Cashing*, 546 U.S. at 445–46; *Granite Rock Co.,* 561 U.S. at 296. Spain's challenge, by contrast, turns on that exact question. As such, I decline petitioner's invitation to defer to the tribunal and will reach the merits of Spain's argument.[4]

The text of the ECT, supported by the subsequent interpretation of the signatories, precludes a tribunal constituted under its authority from disregarding EU law invalidating

---

[4] Petitioners argue in passing that the Swiss court decision should be accorded preclusive effect. *See* Resp. at 32 n.15. However, courts are not required to accord preclusive effect to foreign judgments in petitions pursuant to the New York Convention. *See Process & Ind. Devs. Ltd. v. Rep. of Nigeria*, 27 F.4th 771, 776 (D.C. Cir. 2022). Because the arbitral award affirmed by the Swiss court is not entitled to deference for the reasons previously discussed, neither is the judicial affirmation of that award.

the purported agreement to arbitrate between an EU Member State signatory and other EU nationals.  As such, no valid agreement to arbitrate existed.

International treaties are contracts between nations, and interpretation of a treaty is "a matter of determining the parties' intent." *See B.G. Grp,* 572 U.S. at 37.  In interpreting treaties, courts look first to "the text of the treaty and the context in which the written words are used." *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991).  The "context" of a treaty includes, "in addition to the text (including its preamble and annexes) … any other agreement that was made between all the parties in connection with the conclusion of the treaty…."  The Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, 8 I.L.M. 679 (Jan. 27, 1980) (the "Vienna Convention"), art. 31(2), (2)(a).[5]  Courts may also refer to "conduct of parties to [a treaty] and the subsequent interpretation of the signatories" to clarify the meaning of the treaty's terms. *Air France v. Saks*, 470 U.S. 392, 403 (1985); *see also Medellin v. Texas*, 552 U.S. 491, 507 (2008).  If the parties to a treaty "agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, [a court] must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982); *see also* Vienna Convention art. 31(3)(a).  Finally, courts "shall" also "take[] into account" "any

---

[5] In interpreting treaties, courts may refer to the Vienna Convention on the Law of Treaties (the "Vienna Convention"), which the United States has signed but not ratified. *See* The Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331, 8 I.L.M. 679 (Jan. 27, 1980) (the "Vienna Convention"); *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) (citing the Vienna Convention as a source of "[b]asic principles of treaty interpretation").

relevant rules of international law applicable between the parties" in interpreting the meaning of a treaty. Vienna Convention art. 31(3), (3)(c).

Article 26 of the ECT requires an arbitral tribunal established under its authority "to decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law" in resolving a dispute between a party to the treaty, i.e. a nation that signed the ECT, and an investor domiciled in the territory of another signatory country. ECT art. 26(6). The most straightforward reading of that provision is that any award issued by an arbitral tribunal established under the authority of Article 26 must be consistent with both the ECT itself and any other "rules and principles of international law" that apply to a dispute between the parties. As such, when resolving a dispute between an EU Member State and another EU national, the tribunal must apply "rules and principles" derived from the EU treaties—sources of international law—as those rules are "applicable" to the parties before it. *Id.* Because the agreement to arbitrate between Spain and the Companies was invalid under EU law, *see Komstroy* ¶ 66, there was no valid agreement to arbitrate as defined by the ECT itself.[6] As such, the tribunal lacked authority to decide the dispute, and any award was, by definition, *ultra vires*.

---

[6] While neither the Supreme Court nor our Circuit Court has squarely addressed the deference the Court should accord to rulings by the CJEU, this Court finds those rulings to be conclusive as to the meaning of EU law. The Supreme Court has held that a decision of a foreign jurisdiction's highest court as to the meaning of that state's law is binding on federal courts, analogizing a court's assessment of foreign rulings under Federal Rule of Civil Procedure 44.1 to a federal court's deference to determinations by a state's highest court of that state's own law. *See Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018). The Court also notes that the European Commission filed an amicus brief on behalf of Spain. *See* Amicus Br. This brief represents the official position of the EU and is therefore entitled to the Court's "respectful consideration." *Animal Sci. Products*, 138 S. Ct. at 1870. In this case, given that the amicus brief endorses the CJEU's reasoning in full and the Court has already accepted the CJEU's decision as dispositive, further analysis would be unnecessarily duplicative.

The "subsequent interpretation of the signatories" supports this reading. *Air France*, 470 U.S. at 403. Spain has identified two specific examples of evidence in support of this argument: the 2007 Lisbon Treaty and a 2019 declaration issued by 22 EU Member States—including both Spain and the Netherlands—asserting that arbitration provisions in both bilateral investment treaties and multilateral investment treaties like the ECT were illegal as applied to intra-EU disputes given the CJEU's decision in *Achmea*. Hindelang Decl. at ¶ 47. The *amicus* brief filed by the European Commission in its official capacity as a representative of the EU as an entity in this litigation provides further support for this proposition. *See* Amicus Br. at 17–18.

In ratifying the 2007 Lisbon Treaty, the EU Member States—again including Spain and the Netherlands—expressly affirmed their collective agreement that the obligations imposed on each Member State by the EU Treaties retained "primacy" over inconsistent obligations incurred by the Member States. Declarations Annexed to the Final Act of the Intergovernmental Conference which Adopted the Treaty of Lisbon, Declaration concerning primacy, 2008 O.J. (C 115) 334, Hindelang Ex. 36 [Dkt. # 15-28] ("Lisbon Decl."). The declaration expressly references the "well settled case law of the Court of Justice of the European Union" in expressly incorporating the concept of "primacy" into the EU Treaties. *Id.* Under EU law, "primacy" includes two dimensions, precluding Member States from either enacting domestic laws inconsistent with EU law or, as relevant here, from entering into international agreements with each other or with non-EU countries that would bind the Member States to obligations inconsistent with their obligations under the EU Treaties. *See id.*; *see also Commission v. Council*, Case No. 22/70 (31 March 1971)

15

¶ 15 (expressly precluding Member States from entering into agreements with third parties that would be inconsistent with obligations under the Treaties). The inclusion of this provision in the 2007 Lisbon Treaty, ratified before the events giving rise to this case, reflects the shared understanding of the EU Member States that they lacked the legal capacity to enter into agreements inconsistent with their obligations under the EU Treaties. *See* Vienna Convention, art. 31(3)(a), (3)(c).

The EU Member States subsequently dispelled any ambiguity about application of those principles to arbitration provisions in multilateral treaties like the ECT. In January 2019, following the *Achmea* decision, a collection of EU Member States released a statement speaking directly to the question at issue in this case: whether the EU Treaties are subject to or supersede conflicting provisions of the ECT. The joint statement expressed the shared understanding that "international agreements concluded by the Union, including the Energy Charter Treaty, … must … be compatible with the Treaties." Decl. of the Reps. of the Gov'ts of the Member States of 15 January 2019, Hindelang Ex. 9 [Dkt. # 15-11] ("2019 Decl.") at 2, 5, 6. Both Spain and the Netherlands joined this declaration. *Id.* While the 2019 declaration was prompted by the CJEU's decision in the *Achmea* case, which held that intra-EU BITs lacked jurisdiction under the EU Treaties, *see id.* at 1, the EU Member States expressly stated that the logic of the *Achmea* decision applied equally to multilateral investment treaties like the ECT, *see id.* at 2, 3. Of course, the CJEU affirmed this interpretation in the 2021 *Komstroy* decision. In any event, the "subsequent agreement of the parties regarding the interpretation of the [ECT]" offers persuasive evidence that the EU Member States understood their obligations under the ECT's

arbitration clause to be limited by their obligations under the EU Treaties.   Vienna Convention, art. 31(3)(a).

Furthermore, the text of Article 26 of the ECT prohibits a tribunal established under its authority from disregarding a rule of international law applicable to the parties to the dispute before it.   ECT art. 26(6).   Indeed, the parties, in this context Spain and the Netherlands, agree that this is what the text of the treaty means.   *See* Lisbon Decl.; 2019 Decl.   Because petitioners have failed to "provide extraordinarily strong contrary evidence," this Court will "defer to that interpretation."   *Sumitomo Shoji Am., Inc*, 457 U.S. at 185.[7]

As such, the bottom line is straightforward.   Spain lacked the legal authority to make a standing offer to arbitrate to the Companies under the law that applies to both parties. The tribunal was bound to issue a decision "in accordance with" that law by the terms of the treaty under which it was convened.   Because there was no valid offer to arbitrate, there is no arbitration agreement, which is required to establish subject matter jurisdiction under

---

[7] Petitioners' strongest counterargument, while ultimately unpersuasive, is that the view of the EU Member States is not entitled to any special consideration because the word "parties" refers only to *all* signatories of the ECT and not any subset thereof. *See* Resp.. at 26–27. In their view, the "subsequent interpretation of the parties" would only be relevant if all ECT signatories, not just EU Member States, also shared this understanding. Unfortunately for petitioners, this argument. Even if petitioners were correct, that would only preclude the Court from relying on the shared understanding of the EU Member States to shed light on the meaning of Article 26(6) of the ECT. It would not disturb this Court's reading of the treaty's plain language as requiring decisions issued by tribunals under that authority to render decisions "in accordance with" EU law in intra-EU disputes.

28 U.S.C. § 1605(a)(6).  As such, this Court cannot establish jurisdiction under that FSIA exception.[8]

## II.     Subject Matter Jurisdiction – Waiver

While the Court lacks subject matter jurisdiction under the FSIA's arbitration exception, petitioners, undaunted, also argue that jurisdiction is nonetheless proper under the FSIA's waiver exception.  *See* Resp.. at 12–14.  Under that provision, a court may establish jurisdiction over a foreign sovereign if that foreign state has waived its immunity from suit.  *See* 28 U.S.C. § 1605(a)(1).  In a 2019 case, our Circuit Court held that a foreign state "waives its immunity from arbitration-enforcement actions in other signatory states" by "sign[ing] the [New York] Convention."  *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curiam).  Spain has done so, and petitioners argue that jurisdiction is therefore retained.

Unfortunately for petitioners, this argument is too clever by half.  The scope of FSIA's waiver exception as applied to the arbitration context was defined by our Circuit Court in a 1999 case, *Creighton Ltd. v. Government of State of Qatar*.  181 F.3d 118.  In that case, our Circuit Court adopted a "narrow" reading of the waiver exception, resting on the implicit "requirement that the foreign state [] intended to waive its sovereign immunity."  *Id.* at 122.  One prerequisite to finding such an intention is the existence of an

---

[8] Of course, even were the Court to find jurisdiction, it would still have discretion to refuse to enforce the award under the terms of the New York Convention itself because the parties lacked the capacity to form an agreement to arbitrate "under the law applicable to them."  The New York Convention, art. V(1), (1)(a).

agreement to arbitrate. *See id.* at 123 (holding that all examples of implied waiver arise either from "the foreign state's agreement (to arbitration or to a particular choice of law) or from its filing a responsive pleading without raising the defense of sovereign immunity". No such agreement exists in this case for the reasons previously given, so the waiver exception is insufficient to establish jurisdiction.

Unfortunately for petitioners, *Tatneft* is not a ruling to the contrary.  Indeed, our Circuit Court characterized its decision in *Tatneft* as "holding that the waiver exception applies if the foreign sovereign is a party to the New York Convention and *has agreed to arbitrate* in a Convention state." *Process & Ind. Devs. Ltd. v. Rep. of Nigeria*, 27 F.4th 771, 774 (D.C. Cir. 2022) (emphasis added).  Spain did not and could not agree to arbitrate with the Companies, so the exception does not apply.

Moreover, even absent that clarification, *Tatneft* did not disturb the rule set forth in *Creighton*.  The panel that decided *Tatneft* elected against publishing its decision according to the criteria established by D.C. Circuit Rule 36.  *See Tatneft v. Ukraine*, 771 F. App'x at 10.  Under Rule 36, our Circuit Court will select for publication any decision that, among other criteria, resolves a substantial legal question, "alters, modifies, or significantly clarifies a rule of law previously announced by the court," or "criticizes or questions existing law." D.C. Cir. R. 36(c)(2).  Unpublished cases, on the other hand, are limited to those cases that "do[] not satisfy any of the criteria for publication set out in subsection (c)." *Id.* (e)(1).  The *Tatneft* Court, then, did not see its opinion as altering, modifying, or clarifying the standard set forth in *Creighton*.  As such, this Court will not read *Tatneft* as having overruled the requirement for a valid agreement to arbitrate.

The FSIA's waiver exception does not allow prospective litigants to make an end run around the requirement for a valid arbitration agreement. Because the Court has already found the absence of such an agreement for the reasons previously given, the waiver exception is inapplicable here.[9]

CONCLUSION

Spain lacked the legal capacity to extend an offer to arbitrate *any* dispute with the Companies under the law that applied to the parties. As such, no agreement to arbitrate ever existed. Absent such an agreement, this Court cannot establish jurisdiction under any exception to the Foreign Sovereign Immunities Act. Accordingly, I will **GRANT** Spain's Motion to Dismiss [Dkt. # 15] and dismiss the case. An Order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge

---

[9] Blasket also filed a motion for a temporary restraining order and preliminary injunction on March 15, 2023. *See* Blasket's Mot. for TRO and Prelim. Injunction [Dkt. # 40]. Because this Court concludes that it lacks jurisdiction over petitioners' case, it also lacks jurisdiction to resolve Blasket's motion for injunctive relief. *Make the Rd. N.Y. v. Wolf*, 962 F.36 612, 623 (D.C. Cir. 2020). Accordingly, Blasket's motion is denied as moot.